No. 56.—THE STATE OF GEORGIA *ex rel*, &c. plaintiff in error, *vs.* THE JUSTICES OF THE INFERIOR COURT OF MORGAN COUNTY, defendants· in error.

[1.] The Inferior Courts of our State are not allowed, in their discretion, to withhold a license from any person who applies for the same, and complies with the requirements of the law, in paying for the license, and giving bond and security to keep an orderly house.

Mandamus, &c. in Morgan Superior Court. Decision by Judge HARDEMAN, March Term, 1854.

Lester Markland applied to the Inferior Court of Morgan county, for an order for a license to retail spirituous liquors in that county, having paid for such license, and being ready to give the bond and security required. The Court refused to grant the license, on the ground that the applicant was an unfit person to be so licensed—having been twice convicted of selling spirituous liquor to slaves, contrary to law.

On hearing this return to a *mandamus nisi*, Judge HARDEMAN refused to make the mandamus absolute. This decision is· assigned as error.

J. HILL, for plaintiff in error.

A. REESE, for defendants in error.

*By the Court.*—STARNES, J. delivering the opinion.

[1.] The decision of the Court below, proceeded on the ground, that the Inferior Court of Morgan county was clothed, by law, with a discretion, in the exercise of which they might rightfully refuse the license applied for by the plaintiff in error, although he had paid the county Treasurer for the same, and was ready to give the bond and security required by law. The correctness of this decision, is to be determined by the Statutes of our State on this subject. A review of this legislation is, therefore, proper.

It is agreed, that the first Act on this subject, now of force in our State, was passed in 1791. This was entitled, "An Act for regulating taverns", &c. The first section provided, that upon the petition of any person wishing to keep a tavern, or house of entertainment, the Justices of the Inferior Court, held for the county of such person's residence, shall "consider the convenience of such place intended for a tavern, and having regard to the ability of such petitioner to keep good and sufficient accommodations for travellers, their horses and attendants, may, at their discretion, grant a license", &c ; *provided*, that the applicant should enter into bond, with sufficient security, "conditioned for the keeping an orderly and decent house, with good and sufficient accommodation for travellers", &c. The 2d section required the rates of charges to be fixed by the Court. The 3d provided a penalty for retailing without license. The 4th fixed the price to be paid for such license; and the 5th repealed conflicting Acts, and gave to the corporations of Savannah and Augusta, the right to regulate licenses in those cities.

It is very plain, that by this Act, the Legislature intended to confine the business of retailing spirituous liquors, to keep-

ers of houses for the lodging and entertainment of travellers. It is true, that the original signification of the word *tavern*, implies "a house licensed to sell liquors in small quantities, to be drank on the spot". But this is only one signification of the word, and it is otherwise used; especially in the United States, as applicable to a house affording lodging and other entertainment, to travellers, as well as for the sale of liquors. The context here, plainly proves this; for such keeper of a tavern is required to furnish "diet, lodging, provender, stabling and pasturage", as well as "liquors" to travellers.

Let us remark, also, that the limits of the *discretion* by this Act, conferred upon the Inferior Court, are: 1st. A consideration of the convenience of the locality intended for a tavern. 2d. The ability of the petitioner to supply such tavern with proper accommodation for travellers, their horses and attendants. And that no discretion, whatever, is given the Inferior Court, by which to grant or refuse the license, according as the character of the applicant may be good or bad.

The only provision which seems to have been contemplated, as a protection against the grant of such license, to a person of bad moral character, was the requirement of bond and security, for the keeping an orderly and decent house.

The next Statute on this subject, is the Act of 1809. The first section of this Act, reduces the rates of tavern licenses in our State; and the *second* enacts, that "any person, on application, and complying with this law, may have license to retail spirituous liquors, without being obliged to keep other public entertainment; provided, such person shall give bond and security to the Inferior Court, in the sum of five hundred dollars, to keep an orderly house".

This Act, of course, repeals the Act of 1791, so far as to reduce the price of license; and so far as to allow any person to retail liquors, without keeping any other public entertainment. Its other features are such, as to discountenance the idea, that the discretion now claimed for the Inferior Court, was recognized or contemplated; for, we find the general pro-

vision, that " any person, on application, and complying with this law, may have license", &c. together with that requirement of bond and security for the keeping of an orderly house, which we have regarded as having been probably looked to as somewhat of a safe-guard against the grant of license to a man of bad character.

Now, if the Act of 1791 had conferred upon the Inferior Court the discretion claimed, we might not be prepared to hold, that the language quoted from the Statute of 1809, viz: that " any person, &c. *may* have license", &c. would be sufficiently repugnant to repeal the former Act; especially, as repeals by implication of legislative Acts, should not be favored by Courts. But that Statute granted no such discretion, and we think, therefore, in view of the several reasons which we have suggested, that the construction which we place upon the Act of 1809, is the proper interpretation.

This view is confirmed and put beyond all doubt, in our opinion, by the subsequent Acts relating to such license. These Statutes being *in pari materia,* are referred to by us, as serving to aid in showing what was the legislative meaning in the Acts of 1791, and 1809 ; and for this purpose, only.

"It is an established rule of law, that all Acts *in pari materia,* are to be taken together, as if they were one law, and are to be compared in the construction of Statutes, because they are considered as framed upon one system, and having one object in view". (4 *T. R.* 447. 5 *T. R.* 417.) *Church vs. Crocker,* (3 *Mass.* 17, 21.) *Thayer vs. Dudly,* (*Ibid,* 296.) *Hays vs. Hanson,* (12 *N. H.* 284.) *Harrison et al. vs. Walker,* (1 *Kelly,* 35.)

As was shown in the argument of this case, it has been held, that "if it can be gathered from a subsequent Statute, *in pari materia,* what meaning the Legislature attached to the words of a former Statute, this will amount to a legislative declaration of its meaning, and will govern the construction of the first Statute". *Wayne J. in the U. States, vs. Freeman,* (3 *How.* 556)—citing *Morris vs. Mellin,* (6 *Barn. & Cress.* 454. 7 *Ibid,* 99.)

It is unnecessary for us to adopt this rule, to the full extent here laid down. Nothing is more certain, than that such subsequent Statute *in pari materia*, as a legislative exposition, may be looked to in aid of the effort to determine the legislative meaning of a former Statute; and this is precisely the object with which we here make such reference.

The next Act on this subject, was passed in the year 1825; and the 3d section thereof declares, that when "any person shall apply for a tavern, or retailer's license, he shall pay to the county Treasurer, the fees now required by law, and shall receive from the Treasurer a certificate directed to the Clerk, as aforesaid, (a provision made in one of the foregoing sections,) who shall receive and enter the same, as above directed, (in a foregoing section,) and grant the said license, which shall specify the place where the said retailing is to be done, upon the applicant's giving bond and security, as required by law".

It was insisted, that this Act repealed the previous legislation on this subject, so far as to give to the Clerk of the Inferior Court, instead of that Court itself, the right, or authority, to grant such license.

Such is not our opinion. Comparing this Act with the whole system of legislation on this subject, we think that the Clerk is here referred to, as the ministerial officer of that Court, to whom, for convenience sake, the certificate *is* to be handed; and whose business it shall be, as such ministerial officer, to grant such license. No formal or written petition to the Court being required, and upon compliance with the law, the license being issued, as a matter of course, it was, therefore, only necessary to refer, thus, to the ministerial officer of the Court.

We refer to this Act, as we have suggested, for the purpose of calling attention to the mandatory and unreserved character of the requirement; that when any person shall apply to the county Treasurer, and shall pay him for a license, and receive his certificate, the Clerk " *shall* receive and enter the certificate, and (*shall*) grant the said license"; thus, clearly contemplating the exercise of no such discretion as that claimed for the Inferior Court, but seeming to recognize the issuing of

such license, after compliance with the requirements specified, as matter of course ; and so authorizing the construction which we place upon the previous legislation.

An Act of 1838, too, which requires the applicant for such license, to make oath that he will not sell, or furnish, spirituous liquors to slaves, seems also, to contemplate the issuing of the license "upon the application", and compliance with the requirements specified, without reference to any discretion in the Justices of the Inferior Cout, by virtue of which, they may grant or refuse the same.

Such is the conclusion to which a review of our legislation brings us.   It only remains for us to add, as the emphatic sentiment of this Court, that we regret, more than we are, in this opinion, able to express, the necessity which has compelled us to dissent from the views of the learned and able Judge, who presided in the Court below ; and in the discharge of our duty to place that construction upon our legislation, which withholds from the Inferior Court, a discretion that would enable them to refuse this privilege of a license to unscrupulous and bad men.

Great benefit would result from such a feature in our legislation; we earnestly believe; and we have no doubt, that all good and reputable citizens in our State, whatever may be their views, as to the temperance reform, will agree in recognizing the deeply pernicious influences which result from a traffic in liquors with slaves; and in acknowledging that these evils would be greatly lessened by placing it in the power of the Inferior Court to refuse a license to men who are, in their opinion, sufficiently corrupt to engage in this illicit traffic.

It has been with hesitation, and no little disrelish, that we have felt ourselves constrained to decide that, at present, there is no such feature in our legislation.   But it is our duty to "expound, and not to make the law".   Having discharged this duty, we leave it to the good sense of our fellow-citizens, to that sound and wholesome public opinion, which is necessary to the making and sustaining of all useful laws, to determine

the propriety of further legislative action on this important subject.

Let the judgment be reversed.