## *In re* HOOVER.

(*District Court, S. D. Georgia, E. D*    March 1, 1887.)

1. HABEAS CORPUS—CIRCUIT COURT—SHERIFF.
    Where the writ of *habeas corpus* from the United States court is sought against the sheriff of a state court by one imprisoned for the violation of a state law, the petitioner must clearly show an irreconcilable antagonism between the federal law and the state law under which he is in custody.

2. SAME—CASE DISTINGUISHED.
    The case of *Yick Wo* v. *Hopkins*, 118 U. S. 356, 6 Sup. Ct. Rep. 1064, cited, and distinguished.

3. CONSTITUTIONAL LAW—POLICE POWER—REGULATING OCCUPATIONS.
    Where the political power of a state for the safety of its people takes the responsibility of saying that certain occupations are hurtful, and will not be permitted in its boundaries, unless that declaration is so unreasonable as to be outside the domain of law, the occupation so stigmatized is no longer a right, privilege, or immunity, within the meaning of the constitution.[1]

4. INTOXICATING LIQUORS—RIGHT TO SELL NOT PRIVILEGE OF CITIZEN OF UNITED STATES.
    The right to sell intoxicating liquors is not one of the privileges and immunities of citizens of the United States which by the fourteenth amendment the states were forbidden to abridge.[1]

5. SAME—STATE PROHIBITING OR REGULATING SALE.
    The state may authorize, or refuse to authorize, the sale of liquor on such terms as it thinks proper, and the courts of the United States have nothing to do with the exercise of this police power.[1]

6. SAME—GEORGIA LAW VALID.
    The law of the state complained of in this application is reasonable, necessary, and beneficial.[1]

(*Syllabus by the Court.*)

On Application for *Habeas Corpus.*
*Charles N. West*, for petitioner.
*Fleming G. Du Bignon*, for sheriff.

SPEER, J.  On the twelfth day of February, 1887, Lemuel L. Hoover, a resident of Chatham county, and a citizen of the state of Georgia, was before the superior court of said county, the honorable A. P. ADAMS, J., presiding, charged by indictment with retailing spirituous liquors without a license from the state.   On arraignment, Hoover pleaded guilty, and thereupon he was sentenced; and the court imposed a fine on him of $250, and the costs, and ordered, in default of payment, the alternative penalty of six months' imprisonment in the common jail.   Hoover refused to pay the fine and costs, and was taken into custody by John T. Ronan, sheriff; and that official, with much kindness and liberality of conduct, having been apprised by Hoover that he purposed to test in this court the validity of his conviction, did not confine his prisoner, but detained him constructively.   A petition for *habeas corpus* was immediately presented to me.   Ordinarily, in cases of this character, to grant the writ is a matter of course, and the legality of the detention is determined on the return of the arresting officer.   On this application,

[1] See Ex parte Kennedy, (Tex.) 3 S. W. Rep. 114, and note.

for reasons to me sufficient, I have proceeded with more hesitancy. So great is the reluctance with which the judges of the national courts interfere at any time with convictions before courts of general jurisdiction of the states, that opportunity was afforded the sheriff to show cause why the writ should not be issued. The sheriff appeared by counsel, and on this informal rule to show cause the parties were heard.

The petition alleges that Hoover is illegally restrained of his liberty because he made application to the board of county commissioners for license to sell liquor in quantities less than one gallon, at Montgomery, a suburban resort of Savannah, and the license was refused. This was done in the exercise of the power granted to the commissioners by the act of the general assembly of the state of Georgia approved October 16, 1885, entitled "An act to change the manner of granting license for the sale of spirituous liquors, as contained in section 1419 of the Code of this state, as amended by the act approved December 22, 1884, and for other purposes;" whereby it was provided that "persons before obtaining license to retail spirituous liquors, or sell the same in any quantity less than one gallon, must apply to the ordinary of the county, or to the county commissioners of the county, where such courts exist, in which they desire to retail or sell in any quantity less than one gallon, who have power to grant or refuse such application. Before any license shall be granted, the applicant shall present to the ordinary the written consent of ten of the nearest *bona fide* residents, five of whom shall be freeholders, owning land, irrespective of county lines, nearest to the place of business where such spirituous liquors are to be sold: provided, that this act shall not apply to incorporated towns or cities." The petitioner, having been refused a license, proceeded to sell without it.

The petitioner insists that this statute is violative of the fourteenth amendment to the constitution of the United States, and is therefore void, in that it gives an arbitrary discretion to the county commissioners to prevent him from engaging in an occupation legalized by the state, and without any sort of regard to his personal fitness for the business, or the propriety and merit of his application; that it discriminates in favor of persons residing in incorporated towns, as they need not to obtain the consent of their neighbors, and the county commissioners have no power to deny to them the license.

The powers accorded to the board of county commissioners, or to the ordinary, where there are no commissioners, are certainly unlimited. The words of the act "who have power to grant or refuse such application," are as broadly declaratory of absolute and final control as the anti-bar-room tendencies of the general assembly of Georgia could devise. The unreviewable character of this power is well settled. Under the old law it was held that the justices of the inferior court had no discretion to withhold the license when the terms of the law had been complied with. *State* v. *Justices*, 15 Ga. 413. But in that case the very affluent command of language for which the court at that early period was widely known utterly failed to express its regret that the inferior court did not have power to refuse the license altogether. Since the adoption of the Code,

the supreme court holds uniformly that the power to refuse the license is absolute, and that they neither can nor will permit the discretion of the ordinary or of the county commissioners to be reviewed.  *Wiggins* v. *Varner*, 67 Ga. 583.  It is superfluous to say that this authoritative construction of a statute of the state, embracing a matter of local government, is the law to which this court deferentially, and indeed most cheerfully, conforms, in all cases where such construction is not plainly in conflict with the operative laws of the United States, or with that marvelous compendium of imperishable and dominating principles which the prophetic wisdom of our fathers embodied in the constitution of our country.  To enlist the process of this court in his behalf, the petitioner must clearly show an irreconcilable antagonism between the state enactment and the constitutional declaration.

The argument of the counsel for petitioner embraces the following topics:  Insistence that the liquor traffic is legalized in Georgia by the constitution of the state, art. 8, § 3, authorizing the assessment of a tax on spirituous and malt liquors, and setting apart the fund arising therefrom for school purposes; by the implied sanction of the license act, (Code, 809;) and by the inspection of liquors, (Code, § 1580 *et seq.*)  This traffic, thus recognized and made lawful, must be controlled, he insists, by laws and methods uniform in character, and bearing equally upon all citizens who desire to engage in it; and this law is not equal in its operation and effect, whereas the clause of the constitution relied on declares:  "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  Analogies were argued from precedents where the state was inhibited from restraining interstate commerce, (*Railroad Co.* v. *Husen*, 95 U. S. 465;) and from imposing a license tax on an importer, (*Brown* v. *Maryland*, 12 Wheat. 436;) and from passing *ex post facto* laws, and laws imposing the obligation of contracts.  Great stress is laid upon the authority of *Baltimore* v. *Radecke*, 49 Md. 213.  In that case, in an exceedingly clear and satisfactory opinion pronounced by Judge MILLER, the court held that where a citizen has been granted the permission to erect and use a steam-engine on premises in the city, that an ordinance which clothes a single individual with the absolute power to revoke the permit does not fall within the domain of law, and is inoperative and void; and, under the general jurisdiction of equity, the court enjoined the city from enforcing the unreasonable ordinance.  The courts of the United States could possibly have no original jurisdiction of the question there involved.

It will be observed that none of the cases heretofore cited arise under the fourteenth amendment to the constitution of the United States, and upon that amendment *ex necessitate* the petitioner must predicate his claim for the writ.  He must affirmatively show that he has been "abridged" of the privileges or immunities of citizens of the United States, or that he has been denied the equal protection of the laws.

Unless he has been denied a right in violation of the constitution or laws of the United States, I have no jurisdiction to consider his complaint. To show this denial, the case of *Yick Wo* v. *Hopkins*, 118 U. S. 356, 6 Sup. Ct. Rep. 1064, is strongly relied on by the petitioners. The plaintiff in error, a subject of the emperor of China, was arrested and convicted for violating the following ordinance of the city of San Francisco:

"It shall be unlawful from and after the passage of this order for any person or persons to establish, maintain, or carry on a laundry within the corporate limits of the city or county of San Francisco without first having obtained the consent of the board of supervisors, except the same be located in a building constructed of either brick or stone."

He applied for the writ of *habeas corpus*. It appeared that the petitioner had been carrying on the business for 21 years in the same building; that, from the report of the fire-wardens, there was no reason why the consent of the supervisors should have been withheld. It was alleged in the petition that Yick Wo and 150 of his countrymen had been arrested upon the charge of carrying on business without having such special consent, while those who are not subjects of the emperor of China, and who are conducting 80 odd laundries, under similar conditions, are left unmolested and free to enjoy the enhanced trade and profits arising from this hurtful and unfair discrimination. The ordinance was declared void on its face, as being within the fourteenth amendment, and denying to the petitioner a right, in violation of the constitution, laws, and treaties of the United States. The supreme court of California had sustained the validity of the ordinance, but the supreme court of the United States reviewed their judgment, and held the discrimination illegal, and a denial of the equal protection of the laws, a violation of the fourteenth amendment, and the imprisonment of the petitioner illegal.

There it was clear that the discrimination was directed exclusively against a particular class of persons. It showed as clearly, the mind of the state to be unequal and oppressive; it showed a hostility of race and nationality towards a class whom we were bound by treaty to protect. It was directed against an occupation not deleterious to public health, and not injurious to public morals,—an occupation which, like that of tilling the soil, springs from the inherent right of every man to make his bread. A Chinaman, a negro, a Hottentot, a white man, has the right to the protection of the United States within the limits of the country in any occupation which he has the right to carry on. He may not be deprived arbitrarily of life or liberty, nor can his property be taken without just compensation or due process of law. He may have equal protection in the enjoyment of his personal or civil rights; he may pursue happiness in his own way; equal access to the courts; no liability to greater punishment for crime than is imposed on others for similar crimes. These are instances of the rights which may not be abridged, and of the privileges and immunities in the enjoyment of which he is entitled to the equal protection of the laws. But when the political power of the state

for the safety of its people takes the responsibility of saying that certain occupations are hurtful, and will not be permitted in its boundaries, unless that declaration is so unreasonable as to violate and outrage natural justice, it is a purely political responsibility, and there is an end of the matter. *Salus populi suprema lex*, and the only appeal is to the force of public opinion, or its expression at the ballot-box. That occupation so stigmatized is no longer a right, privilege, or immunity. Is the sale of intoxicating liquors an occupation of that sort? Let the supreme court of the United States answer. "The right to sell intoxicating liquors is not one of the privileges and immunities of citizens of the United States which by the fourteenth amendment the states were forbidden to abridge." "The weight of authority is overwhelming that no such immunity heretofore existed as would prevent state legislatures from regulating, and even prohibiting, the traffic in intoxicating drinks." *Bartemeyer* v. *Iowa*, 18 Wall. 129. "No one," said Mr. Justice BRADLEY, in his concurring opinion in that case, "has ever doubted that a legislature may prohibit the vending of articles deemed injurious to the safety of society, provided it does not interfere with vested rights of property. When such rights stand in the way of the public good, they can be removed by awarding compensation to the owner. When they are not in question, the claim of a right to sell a prohibited article can never be deemed one of the privileges and immunities of the citizen."

Now, if the state may prohibit the sale of liquor altogether, since it is clearly not a "privilege or an immunity" in the meaning of the constitution, may it not authorize the sale on such terms, by such persons, and at such places, as it thinks proper? And, if it may do this directly, may it not delegate to others the exercise of the power? It has simply delegated a portion of its sovereignty to the county commissioners of Chatham county. The commissioners, in the exercise of that sovereignty, refuse a license to the petitioner. The discretion must rest somewhere. The state might have exercised it. It intrusts its discretion to the board of county commissioners, and, as I have said, by the terms of the grant, this discretion is final, and not reviewable. This power is inseparable from the sovereignty of the state. The powers of the courts of the general government have nothing to do with it. It is a local regulation, and relates exclusively to the internal police of the state. *License Cases*, 5 How. 573. "It is not necessary," said Mr. Justice GRIER, in concluding his opinion in that celebrated case, "It is not necessary, for the sake of justifying the state legislation now under consideration, to array the appalling statistics of misery, pauperism, and crime which have their origin in the use or abuse of ardent spirits. The police power, which is exclusively in the states, is alone competent to the correction of these great evils, and all measures of restraint or prohibition necessary to effect the purpose are within the scope of that authority."

It is insisted by the petitioner that the act of the legislature and the action of the county commissioners is so unreasonable that the authority of the case cited from 118 U. S. 356, 6 Sup. Ct. Rep. 1064, will compel his release. Certainly in the cases respectively considered the occupations of

the persons affected are very different in character. There is but little in common between the bar-room and the laundry. The laundry is pronounced by the supreme court in the case cited to be a "harmless and useful occupation." Unquestionably it is not without its influence upon the advancement of civilization. The necessities of sanitation, of decency, of adornment, and many other requisites of civilized society, if not expressly, certainly by implication, compel us to accord to the laundry a large degree of usefulness, and, indeed, of indispensableness. Who can "view with alarm" the multiplication of laundries? Their very implements are innocuous. I can recall no instance in history or literature where they have been used "contra bonos mores." True, the amorous and oleaginous Falstaff, by his merry and fair tormentors was secreted in a buck-basket, but this seems to have mortified his evil disposition. "Have I lived," cried Sir John, "to be carried in a basket like a barrow of butcher's offal, and be thrown in the Thames? A man of my kidney, think of that, that am as subject to heat as butter, a man of continual thaw and dissolution. It was a miracle to 'scape suffocation." The more modern breaker of hearts, the wicked but irresistible Mantalini, when he was degraded to turn the mangle in the laundry, looked upon life as a "demned horrid grind." Surely, the maxim that "cleanliness is next to godliness" is the ample title of the laundry to the equal protection of the laws. It is painfully true that the occupation of the petitioner is not regarded by the courts as a "harmless and useful occupation." To cite cases upon this proposition is a waste of time.

The particular legislation before the court, affecting as it does the rural communities of the state, was of supreme necessity and of supreme reasonableness. In incorporated towns and cities the law is presumed to be present in the persons of its municipal officers and its police force. The brutal excesses of ungovernable and dangerous men, when inflamed with drink, may be readily repressed, and the perpetrators punished. It is otherwise in the quiet and sparsely settled neighborhoods, where the farmers, and their wives and children, "far from the madding crowd's ignoble strife pursue the noiseless tenor of their way." The cross-roads groggery was the bane of our civilization. A simple, artless, and industrious laboring population, inflamed and ennervated with drink, became worthless as laborers, irresponsible as citizens, unreliable in all the relations of life, and the more vicious very dangerous to society. It is superfluous to dilate upon facts so well known, and which have mainly caused the tremendous wave of public sentiment towards local option. It is historically true that incalculable benefit has been accomplished under the operation of this law, and that of which it is an amendment, by conscientious and fearless county officials who have steadily refused to license dram-shops where there could be no police supervision. I state these things because, in considering the reasonableness of the law, the court will take cognizance of the history of the times in which it was enacted, and, understanding the mischief, can the better understand the remedy.

Notwithstanding the great ability and learning with which the application for the writ was urged, I must decline to grant it, and it will be so ordered.